Thank you, Your Honor. May it please the Court, I am James Laughlin, and I represent the Appellant Ronald Henderson. With the Court's permission, I would like to reserve three minutes of my time for rebuttal, and I'll watch my time. The District Judge has sentenced Mr. Henderson to ask this Court for guidance about whether and how Kimbrough applies the child pornography outline to the District Attorney. This Court should answer that call for help by issuing a decision similar to the one the Second Circuit recently issued in Dorgan. Mr. Laughlin, I have some cases from other circuits, but they simply don't address, at least in any meaningful way, the issues now before the Court. It's important to recognize that there are really two things going on in the appellate courts, and we shouldn't conflate the two. The first issue is how Kimbrough applies to 2G 2.2, and there's really only two courts that have looked at that. The Second Circuit in Dorby and the Third Circuit in Grover. They've looked at the history, they applied to Kimbrough, and they both came to the same conclusion. They agree that 2G 2.2 is not based on empirical data and does not represent the Sentence Commission's characteristic institutional role, and therefore, it's exactly the kind of guideline that Kimbrough applies to. There's really no persuasive argument to the contrary. In fact, the government's conceded that point in Grover, Huff, Steadler, and Stone. Kagan. Well, just to try and clear the dialogue a bit, the point, is the point that district courts may disregard it or district courts must disregard it or that we should have a circuit rule that district courts should disregard it, or exactly what is the point? I think, again, what the Second Circuit did is probably the best course that can be followed at this point, which is to explain the background, to explain, and there's something that shouldn't be disputed among district courts. It's something that this Court can resolve. It can say, here is the history of 2G 2.2. Here is Kimbrough. We're making a finding that it is not based on empirical evidence, and therefore, Kimbrough applies. That then becomes something that is not a matter of dispute among the courts. They know they have the discretion, and then they have to figure out how to exercise the discretion. The next step is, how do they exercise that discretion? And, again, the Second Circuit went beyond just saying that they have the discretion. It said, it encouraged the judges under their jurisdiction to take the discretion seriously and to keep in mind that 2G 2.2 is, quote, an eccentric guideline of highly unusual provenance, which unless carefully applied can easily generate unreasonable results. So I don't think this Court is in a position now to say a district court can never follow this guideline, but I think it is in a position like the Second Circuit to say this is a very problematic guideline, and you have to be very careful when you apply it. But what if the facts of your particular case are such, you know, you're a sentencing judge, and the facts of your particular case, you look at it, and, you know, I mean, I've sentenced people, and I think that judges on some level, you know, you kind of decide what you think something, you know, you have in your mind what things are worth, and it's a spectrum over what you've given other people, you know, how you evaluate conduct. And, you know, you look at Mr. Henderson, and you say, well, you know, I think when I look at 3553, you know, I get to a place where I'm pretty comfortable that that seems to measure what he did. Then do you have to go into this whole Kimbrough analysis? Yes. If it's raised, yes. Because what this Court has said in Carty, and that follows what the Supreme Court said in Rita, is the starting point for the analysis is the correct calculation of the guidelines. And so that's still the starting point. But the guidelines are still their advisory. We know that now. That's correct. That is correct, Your Honor. And so I think under Kimbrough now, in a case where you have the problems like 2G2.2 has, the next step is to say, you know, what weight do I give to these guidelines? Because I have to list just one of the factors listed in 3553A. I need to balance against the other factors. Is it something I should have a lot of confidence in, or is it something that because of the congressional interference and the way that it got, as the Second Circuit said, cobbled together in a weird way, make it something that's not really worth looking too closely at? How can anyone really ever know what Congress does? And, you know, I mean, essentially, I mean, do you have to come to the conclusion that they just did what the Sentencing Commission said and they didn't have any reason to do it, or what? You know, I mean, clearly we don't entirely.  Congress are not. Yes, yes. Well, that's true. And, again, this is an argument the government makes. I want to make clear that Congress retains the ability to tell the Sentencing Commission, you have to add this enhancement. And Congress and the Commission did that. And, as I said, the first step of any sentencing is to correctly calculate the range, and you have to add in all those enhancements, however unfair they may be. But what Kimbrough taught us is the next stage is some guidelines are less reliable than others because the whole guideline system is based on the Sentencing Commission exercising its characteristic institutional role to look at past sentencing practices, get advice from all across the criminal justice spectrum, prosecutors, defense lawyers, social scientists, academics, and to tweak the guidelines as they go along to make sure that they are adequately dealing with the problems of sentencing that are seen. Congress, with regard to the child pornography guidelines, has cut that short. It has put certain things into this guideline that the Commission has to do, that even one example, the computer enhancement, Congress said that has to be in there. The Commission says, you know, this is back in 1995, we don't really think this makes a lot of sense because, you know, nowadays everybody is using a computer, and it might make sense that people who are using a computer to set up a website to pay for the distributing stuff, that makes sense. But to just apply it to everybody, it doesn't. But they have no choice. They can't, even today, they can't amend that guideline to take that out. And the same thing with the number of images adjustment. That was set by the PROTECT Act. The last thing. The number of images adjustment, which was set by the PROTECT Act. If the Sentencing Commission gathered up evidence, and they are gathering up evidence, is evidenced in the statistics that were cited in both Dorvey and Grover, particularly the surveys that were done of district judges who are very displeased with this guideline, if they look at it and they say, you know what, this is not going the way it should, there's very little they can do because they can't take out the things that Congress has told them to put in. And that's why this guideline is different from most. It's one that does not have the value that the guidelines are supposed to have as the starting point in the 3553A. You began by saying that there were two kinds of court of appeals cases, and I personally deflected you from that. So what was the second kind? Okay. The second kind are the ones that talk about what role does the Kimbrough analysis play at the appellate level when this court or another appellate court is reviewing a sentence. And, of course, the court reviews a sentence for both procedural and substantive reasonableness, and I want to explain why Kimbrough applies at both phases of that review. With regard to procedural error, clearly a judge commits procedural error if it does not exercise Kimbrough discretion when asked to do so if it doesn't understand what its Kimbrough discretion is. And I think that's happening a lot, and I think a lot of it stems from the kind of sentencing memorandum that the government is filing in these cases. If the court looks at what it filed in Mr. Henderson's case, which is at page 122 to 129 of the excerpts, which based on my practice is fairly typical of what they're filing, at least in this district, you'll see that they're telling the court, you know, hey, this is a very reliable guideline. You know, it's based on good evidence, and it's based on congressional policy that you have to follow, and Kimbrough just doesn't apply. They're not saying what they suggest on appeal here, which is, hey, it was the district court was free to, you know, disregard this guideline, and it chose not to do it, so this court has no ability to appeal that. And so for the government to say now that you can't second-guess a district court's decision not to exercise Kimbrough discretion when there's a lot of confusion about what that Kimbrough discretion is, is pretty unreasonable. Kagan. I have a question. I think perhaps my largest concern here is that we seem to have two Ninth Circuit cases not on these guidelines, but on other guidelines in which Kimbrough arguments were made that seem to be heading off in opposite directions, Mitchell and Gonzales-Santel. So can you tell me whether that's true and what we, as this panel, should be doing about that in trying to figure out what our precedent is as to Kimbrough analysis in general, not as to these particular guidelines? Phillips. Okay. I didn't catch the first cite, which is? Kagan. Isn't it Mitchell and Gonzales-Santel? Am I right? Phillips. Okay. Gonzales. I don't remember Mitchell being cited. I'm afraid I was. Kagan. I don't know if it's not cited, but it is a case in which they did seem to apply Kimbrough analysis. Phillips. Okay. I apologize. I don't – I'm not familiar with that case. Kagan. Well, I think the other one is the one that's your problem, so maybe you can tell us about that. But Mitchell sort of supports you, and it's kind of confusing about what we're supposed to do next. Phillips. Well, I can respond to Gonzales-Santel, and that, I think, is a very – you know, a case that's easily distinguished on its pertinent facts. The courts have prior case law saying that disagreement with the policy of the government which allows fast tracks in some districts and not fast tracks in other districts isn't a reasonable basis for a departure or a variance in sentencing. And the issue in Gonzales-Santel was, has Kimbrough so undercut that argument that a three-judge panel can revisit that prior case law and come to a contrary conclusion? And what it said was, given Kimbrough, that it didn't meet that standard and we have to follow old precedent. I think so. I think it was. I think it was. But beyond that, putting aside the fact that that panel may have felt constrained about being able to deviate because Kimbrough wasn't directly on point, I think that its Kimbrough analysis can be easily distinguished on this basis, because I think we're talking about apples and oranges. Kimbrough, without a doubt, applies to the exact situation we're talking about here, which is where you're talking about the calculation of an offense level under a guideline. And if there's evidence that the crafting of that guideline and those enhancements are not based on empirical evidence, then Kimbrough says directly, then courts are free to recognize that fact and have the discretion to do so. What Gonzales-Santel says is that Kimbrough does not address a district court's ability to vary from the guidelines based on disagreement with congressional policy, the situation we confront here. So I don't know. Right. I agree there's some troubling language in there, but I don't think – I think that that language has to be given the context it was made. And I think that it's one thing for the Court to say that Kimbrough did not address and therefore did not allow the Court to revisit its prior holdings that judges aren't free to consider congressional policy regarding kind of broad things like the fast track. But there's no doubt what Kimbrough did was exactly what we're asking the Court to do here, which was when you're looking at the offense level of a guideline. You're sort of suggesting that the fast track is sort of a different realm because it's really not a – it's not – it's a policy of a different height. It's a policy of speeding up the courts rather than a policy about three – five – five, three factors and who deserves what sentence sort of. Correct, Your Honor. And it also is a policy of a different sort in that it also brings in a separation of powers, prosecutorial decision-making as to when to extend a fast track and when to not. And for all those reasons, I think the result to tell is easily distinguishable. Well, if you want to reserve some time now, that might be a good time. Thank you. Thank you. May it please the Court. Mark Yochalam on behalf of the United States. Your Honors, I'd like to begin. Mr. Lockham and I disagree with that a lot in this case. But there is something that we agree on, which is that district courts absolutely under Kimbrough have discretion to disagree with the 2G2.2 guidelines and because of that policy disagreement to sentence below the guidelines. And where I disagree with Mr. Lockham is the argument that the government told the district court otherwise. If you look – and I realize there's a big legal question here. Well, that doesn't really matter. I mean, it will eventually matter. But right now the problem is that the district court seemed to be saying that he didn't know whether he could do that or not and he wanted to hear from the Ninth Circuit. And that's not the case here. Your Honor, I disagree with that characterization of what the district court said. And I note that in the appellant's opening brief, the key language that sort of makes that argument is in brackets or it's a paraphrase. I know. But in fact, that was the argument that he didn't address. I mean, there was an argument at some length in the sentencing memoranda, and it's obviously the elephant in the room, that he said, I don't know what to do with this. Ask the Ninth Circuit. Well, he obviously knew he had some discretion because he downwardly departed, correct? Yes. Your Honor, the district court did not say, I don't know what to do with this argument. I'm throwing up my hands. He said, I'm not accepting this argument until the Ninth Circuit says I have to. Where did he say that? It is where he said the I would also say you presented other arguments. I'm going to need direction from the Ninth Circuit before I can accept those arguments. I'm not accepting the argument you made along those lines. Your Honor, I read that, and I realize there is some ambiguity if you take just that language, there is some ambiguity. But the bottom line, therefore, is that you would have no problem with an opinion of this Court that said that even though the these were congressionally directed guidelines, district courts have the discretion under Kimbrough to disagree with them on policy grounds or disregard them. Yes, Your Honor. So you're just making a completely case-specific argument that that isn't what happened here. There are a couple of arguments here. First, the government's position is there is no procedural error. If you look at what the parties said, for example, defense counsel said, the government has conceded here today that it is a matter of discretion whether to disagree with the guidelines. No one is saying that the court does not have discretion to disagree with the guidelines. And the court responds, that train left the station a long time ago. Let me be clear on the record. I understand that. So here, that's page 3. Now, the government would be perfectly happy with an opinion that said what I just said and then said, but the district court understood that, so therefore, the petitioner, the appellant loses. Yes. Now, beyond that. So we have no disagreement about anything but the application to this case? I think there are additional areas of disagreement, and that is with what the defendant is requesting in terms of a Dorvay-like opining on the general righteousness of the 2G2.2 guidelines. And there, there is a wide area of disagreement both about the propriety of that First, I want to say why this case, it's not appropriate for a Grover-Dorvay-style opinion. It's a terrible vehicle. And the reason why is, you know, appellants start by saying there are two kinds of cases, and the only cases that really address 2G2.2 in Kimbrough are Dorvay and Grover. That's just not right. There's the Stone decision. There's the Huffstetler decision. There's the recent Seventh Circuit decision we cited in our 28-J letter. There are a slew of them. What is different about Grover and Dorvay, in Grover, the district court exercised its Kimbrough discretion. Now, there are a host of other issues there, but that case went up on appeal with a district court having exercised Kimbrough discretion. That did not happen here. What's different about Dorvay is in Dorvay, the Court of Appeals concluded that the sentence was substantively unreasonable. And it was in that context that the 2G2, 2G2.2 analysis arose. Here, Your Honors, the sentence is not substantively unreasonable. And it's not substantively unreasonable because of the horrendous facts of defendant's conduct. This is a situation where you have a defendant who had potential, you know, he had these two underage girls who he brought back. He had a naked picture of one of them. He had over 8,000 images. The images included horrendously graphic material, including, for example, images of very young girls being anally and vaginally raped. Was he distributing anything or was he on one of these? He was distributing, Your Honor. He used two pieces of software, Picasa, which is actually a fairly benign piece of software that Google created that lots and lots of people used to share photos. He was also using LimeWire, which is a peer-to-peer system. And I don't know how much, Your Honors, know. I can give a very quick description. The difference between a peer-to-peer system and a typical hub-and-spoke server and user system is that a peer-to-peer system has no heart to it. It's each individual user acts as both a downloader and an uploader. Now, in this case, he was not only downloading and uploading each time he decided to go out and obtain one of these 8,000 videos and pictures. He would be uploading that to other users even as he downloaded it. But he also sort of acted as a mini-server himself, that by organizing all 8,000-plus images in these directory structures, any other user of LimeWire could access. I want to get back to the larger picture for a minute. What's really strange, and this may be what Kimbrough meant, but is that we now have every district judge is a policymaker, and every district judge can – and this seems to be your – that you agree – your view. And in the absence of a Dorvey-like admonition, which isn't a directive, but it's an admonition, we have complete disarray among the district courts based on their own – we would have – based on their own policy predilections. And that just seems completely, you know, the opposite of at least what the aspirations of the guidelines are. Now, I suppose it may come about because of Booker, and that may be the answer, and maybe that's just where we have to leave it. But that is what the result would be, would it not? Your Honor, I think this is the sad result of Booker, is that the price of giving the great discretion that district courts historically did have prior to the guidelines and now have again is that there can be wide areas of disagreement. And the decision in Kimbrough basically said that part of that great discretion given to the district courts is for them to make their own policy judgments based on their own experiences. But, I mean, but then, I mean, who are we to – you know, I disagree with Congress a lot, but I don't think – but I still think there's a separation of powers issue at some point. So how are we going to draw those lines? Well – I mean, is then every time, you know, and then what's going to be the effect of every, you know – I mean, district judges all have statutory, you know, congressional acts that they don't like or, you know, the way that they do it. And then we're going to have to review those and decide in their analysis, was the policy really wrong or right that – I mean, that gives us a whole other thing that we're going to have to do. I'm not saying we're lazy because we're not. But I've seen how – I mean, how would you construct this? I begin with saying this is not something that the U.S. Attorney's Office has constructed or sought out. This is what – what the reality is post-Booker and post-Kimbrough is that district courts are invested with great discretion. I suppose one answer is that Congress can direct – isn't disqualified from having mandatory sentencing, but the price of it may be apprentice hearings. Yes. In other words, the reason all this is coming about is because in order to avoid having to have a jury decide beyond a reasonable doubt, you know, whether this was sadistic or very masochistic, the price of that is that there has to be discretion. Yes. And, moreover, I think the fear of wild disparities, first of all, is a well-founded one. There are significant disparities in the system. That was what the guidelines were designed to combat. Post-mandatory guidelines, many disparities have re-arisen. This Court does exercise a check on that through its substantive reasonableness review. Now, I realize that historically that that is a very deferential review. I would think that if the kind of complete disarray that Your Honor suggests follows – Well, it's a pendulum, you know, in terms of that we want – we don't – we want judges to sentence people, and not everyone's the same, and it should be individualized. But then when it goes so off the reservation, then we get things like mandatory sentences, and then we're back in the same – Yes. I think that's right, Your Honor. If one person's getting probation for – you know, in California we had it if you could get probation to rape, and then other people, you know, then they passed it. No, you have to go to prison if you commit a rape. Yes. And I think mandatory minimums may be one approach. Obviously, there are some mandatory minimums even in this area. For example, the Garza case, which is coming up a couple arguments from now, there was a mandatory minimum of five years. I just want to briefly talk about the second reason why I think the Dorvay approach is wrong, and that is that the government simply thinks that the reasons of advance in Dorvay against the guidelines, the same reasons that defendant advances here, just aren't persuasive ultimately. Now, there's this term empirical that's used, and I want to be clear about what empirical means. What the commission does empirically is look retrospectively at what district courts do. So one alternative way of calling it would simply be a retrospective approach. What Congress did here was not unempirical in the scientific sense. It was unempirical in the sense that it was prospective. Congress is saying rather than just adopting past practices, we want stronger punishments. Now, there are times where a purely retrospective approach may be better, but there are also times when a prospective approach is better, such as where a crime is rapidly changing and rapidly worsening. And here, Your Honors, that is what has been going on. And just to give one fairly trivial example, if you were to look at the sentences or the incidents of the sadomasochistic enhancement, starting in 2002, it appeared in only 42 percent of cases that defendants had sadomasochistic pornography, 48 percent the next year, 54 percent the next year. Well, that doesn't – you can't really get behind that number unless you know whether the same standards were being applied in the charging practices. Well, that's true, Your Honor. But I think a fair inference is that you don't see a doubling in the rate. And I should also add that the literature here, and if Your Honors like, I could point you to some articles on it. I guess I'm not sure what you're asking us to do. Are you saying the judge understood he had Kimbrough discretion here, so dodge the bullet and don't publish and affirm the judgment, or what? No, I think the court – first of all, I would never urge a court to dodge a bullet. If you think that there is an issue that is squarely presented here – And what should – then what should we publish? I think what the court's decision here should be, whether published or unpublished, is that the record as a whole shows that the district court understood it had Kimbrough discretion and elected not to exercise it, in that the ultimate sentence imposed, though stern, was reasonable given the horrendous facts of this case. And that, I think, is all the court needs to say here. Now, there may arise – So what does that say about Kimbrough discretion? It doesn't really say anything about it. Or the court could say the district court had Kimbrough discretion, recognized it had Kimbrough discretion. So the published part about that is you're acknowledging it relative to this particular section. Yes. And I don't think that the existence of Kimbrough discretion turns on there being problems with 2G2.2. Do you want to comment on the Ninth Circuit case and all these two cases? Do you know about Mitchell? Yes. Your Honor, I think that the distinction with the fast-track situation is that there – the question was not – What I'm more concerned about, frankly, is that we seem to have two cases going like  Well, I think that the fast-track situation is different. There is a question of whether there is an unreasonable or unwarranted disparity. And one way of looking at that decision is saying it's not an unwarranted disparity if there's a congressional policy saying that in some of these cases You're basically agreeing with your opponent on that question, i.e., that on the question of whether you can apply Kimbrough discretion at the district court level with regard to a congressionally imposed guideline, the answer in that case is not dispositive. Yes. I think, Your Honor, that if the district courts have to follow Congress's instructions in the form of mandatory minimums and statutory maximums, but with respect to congressional input to a guidelines provision, there there is Kimbrough discretion. But I do want to say that the fact of congressional influence, it doesn't mean that a guideline can just be ignored. And that's what the government was trying to say below and in its briefs here, is that as with any other guideline provision, a district court is not at liberty simply to ignore the guideline. Well, but, I mean, apparently it isn't under Kimbrough. I mean, it has to make a policy decision that it disagrees with it. But that's my understanding of what Kimbrough, the difference between the ordinary approach to the guidelines and a Kimbrough approach to the guidelines is that after you've calculated the guidelines, you then say, but I think this is a guideline that is just, I disagree with as a matter of policy, and I'm simply taking it off the table and going forward, and that you can do that. I think that it, provided there is sufficient engagement, I think if a district court merely said. You'd have to do some analysis if you're going to do that, wouldn't you? Yes, exactly, Your Honor. I think a district court cannot say, I'm calculating the guidelines, but I don't care because I'm not going to follow the guidelines. I mean, this is what's odd about this. And then I'm going to have to ask you to sit down, but I have to respond to this, or anything else my colleagues have to say, questions I have. The, what's odd about it is that the policy issue keeps repeating itself. It isn't necessarily case specific. So it seems totally ridiculous to have, I mean, why couldn't a district judge just say, I agree with you, they, finished, I'm to God. It's off the table. I mean, does every district judge have to bare their soul in terms of why they don't like the guidelines? No, Your Honor, absolutely not. I think certainly nor do they have to bare their soul in why they agree with the guidelines. Right. Merely that it would not be sufficient to dismiss it without any explanation whatsoever. What you're alluding to, a reference to Dorvay, is the kind of shorthand that lawyers and judges employ all the time, which is we rely upon these quick signals, like there's the joke about guys on an island that say, oh, number 42, and everyone laughs. It's how you deliver it. You know, here, Dorvay means a package of things. And that package of things is the kind of sort of Stabenow-type arguments that are being made. And that would be sufficient for a judge to say, that's what I agree with, and I'm not going to spell it all out for you right now. Yes, I think so, Your Honor. But on the other hand, I think it would be sufficient for a court to say, I don't agree with Stabenow, I don't agree with Dorvay, and I think Congress should be listened to in this context. Both of those approaches are reasonable, and I think the Dorvay court sort of came out in the wrong way of trying to put its thumb on the scale. That should be left to the district courts. Okay. Thank you very much. Counsel, in this case, should we say, Kimbrough holds this. We're not sure that you exercised your discretion in light of Kimbrough because you said you're waiting for us to tell you what it means. This is what it means. Remand. No, Your Honor. I don't think that's what the court should do, though, of course, if the court reads the record that the district court didn't know whether it could exercise discretion, your approach is the correct approach, Your Honor. I think if you look at the record, it's clear that the district court said, let me be clear on the record, I understand that I have discretion under Kimbrough. I think there is no reason to remand it to basically have these arguments all rehashed a second time. I think there's an interest in finality here. And I think the court should be able to say, if the district court had not been there, they had an opportunity to make their arguments below, and the court rejected them. Okay. Thank you very much. Thank you, Your Honor. Mr. Yohalam, you have some time left. Mr. O'Rourke. I'm sorry. You're not Yohalam. You're Mr. Yohalam. You're Mr. Larkin. First of all, I'm very pleased to hear Mr. Yohalam come in and make the concession he did. And I think that if he had made, if the government had made that earlier and the sentencing record was below, I think the judge would have really understood the sentencing discretion. I don't think, I'll just say, I don't think that there is any record to say that the court understood his sentencing discretion under Kimbrough. I think the statements the government points to talk about his sentencing discretion generally, which it exercised in a way to take care of, take into account my client's horrendous personal background and give him a three-level variance. But the only thing he said about the Kimbrough argument specifically was, I need help from the court. And I think the court should give it to them. And also, in regard to the same issue, on page 26 of the sentencing transcript, page 26 of the sentencing, or the executive record, the court actually says, this is the first time I'm hearing this Kimbrough argument. So I don't know whether the court has a different position on it now, but it was very novel and the court asked for help. The next point with regard to the facts of the case that Mr. Nolan cited to, I think that, again, that's something that the district court needs to take into account once it knows about its Kimbrough discretion. The government can stand up there and say, okay, here are the reasons why you should move towards the best. I want to ask you this. If it goes back, is the district court limited to the sentence that it gave? Or can it go up? Do you run a risk? I would love it if you would say it couldn't go up. I don't think so. No, I think that the typical practice under Matthews is for an open resentencing and, you know, everybody takes their chances one way or the other. But I do think that it would be a much different proceeding if the court recognizes that the guidelines aren't as useful a tool as they may be in other cases where they don't have this imperative. But I gather that your ultimate response to the question of whether we can have complete disarray among the – whether we as a district, as a court of appeals could have a policy position under Kimbrough, the answer seems to be no. At least not further than the Duvet Second Circuit one. I agree. I think the court should go the Second Circuit route. But we couldn't, for example, say, you know, we, the court of appeals, have a policy disagreement with these guidelines, and they seem to me to be – seem to us to be guidelines that district courts don't want to follow, shouldn't follow. That's up to the district courts. I have no authority that would allow me to make that decision. So in the end, we do have some, even under the Duvet approach, a fair level of disarray as to what will happen after that. Correct. Although, as I pointed out in my briefs in the section on substantive reasons, and the government disagrees with this, even if this Court makes a Duvet-like opinion, there will still be a role for this Court to play in subsequent sentencing, because contrary to what the Seventh Circuit said in Huff's Devler in the per curiam decision about any analysis, repeated over and over again, an appellate court can't just say, hey, you know, Kimbrough, that's just a district court issue. It has nothing to do with our review. It does – it will play a role in this Court's review because this Court, like the district court, balances the 3553A factors in the substantive reasonableness analysis. It can't do that without knowing how much weight to give 2G2.2, and it can't figure that out without taking into account the flaws in the guideline. Furthermore, because the guideline is flawed, it undercuts the general premises this Court operates under, which is that a guideline sentence is reasonable because the Sentence Commission, in fact – in fashioning it, has taken into account all the 3553A. Okay. Thank you very much, Mr. Monahan. You both did a very good job. Thank you. The case of United States v. Henderson is submitted. And we'll go on to the four follow-on cases, the first of which is United States
judges: Fletcher B. , Berzon, Callahan